FRANCES M. TOMS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toms v. Commissioner
Docket No. 17863-89
United States Tax Court
T.C. Memo 1992-125; 1992 Tax Ct. Memo LEXIS 150; 63 T.C.M. (CCH) 2243; T.C.M. (RIA) 92125; March 3, 1992, Filed *150 Decision will be entered for respondent. Robert H. Williams and Ronald M. Warren, for petitioner. Mildred M. Moon, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: The issues for decision are: (1) Whether respondent's determination of petitioner's taxable income from her freelance escort/prostitution business for the years in issue is correct. We hold that it is. In so holding, we reject petitioner's cash hoard claim. (2) Whether amounts received by petitioner from Samuel Cohen during 1981, 1982, and 1983 and Joseph DeFelice during 1982 and 1983 were nontaxable gifts or taxable payments for escort and sexual services. We hold that these amounts were taxable payments. (3) Whether petitioner is liable for additions to tax for fraud pursuant to section 6653(b)[1] for 1981, and section 6653(b)(1) and (2) for 1982 and 1983. We hold that she is. *151 (4) Whether assessment and collection of tax for 1981 and 1982 is barred by the statute of limitations. We hold that it is not. (5) Whether petitioner is liable for additions to tax for substantial understatement of income tax pursuant to section 6661 for 1982 and 1983. We hold that she is. Following an amended answer, respondent now contends that petitioner has the following deficiencies in and additions to taxes: Additions to Tax
Sec. Sec. Sec.
Sec.
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
1981
[2] $ 62,443.11
$ 31,221.56
--    --
--  1982
33,168.08
--   $ 16,584.04
[3]
$ 8,292.02
1983
36,449.00
--   18,224.50
[3]
9,112.25
Respondent bears the burden of proof on the increased deficiency and sections *152 6653(b) and 6661 additions to tax for 1982. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 889-890 (1981). In the alternative to the fraud addition for 1982, respondent asserts that petitioner is liable for the addition to tax for negligence pursuant to section 6653(a). Petitioner stipulated that all or part of the underpayment on her Federal income tax return for 1983 was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
Petitioner resided in Sewell, New Jersey, when her petition was filed. Petitioner is also known as Frances M. Granato, Frances Mary Granato, and Frances Mary Toms. Petitioner met Paul Toms in April 1974. He was 30 years older than she. Petitioner was married to Paul Toms from October 8, 1976, until his death from lung cancer on July 31, 1978. 2. Petitioner's Escort and Prostitution Business
In 1981, 1982, and 1983, petitioner ran a freelance escort service and a house of prostitution. Petitioner employed approximately five women as prostitutes from 1981 through 1983. Petitioner also employed three male escorts from 1981 through 1983. As the manager-owner of the business, *153 petitioner made all decisions including advertising, telephone service, keeping of the ledgers, and handling of the money. Petitioner preferred customers who were financially generous older men. Petitioner's business provided both escort and prostitution services. The escort services included, for example, dates and visits to customers. The majority of petitioner's customers wanted sexual services. Prices charged by petitioner ranged from $ 35 to $ 125 per service from 1981 through 1983. From 1981 through 1983, each employee working for petitioner received approximately $ 30 for providing sexual services. Petitioner received the balance of the fee paid by the customer. Petitioner advertised her escort service from 1981 through 1983 in the Atlantic City Press, Atlantic City Magazine, New Jersey Monthly, Salem County Times, Gloucester County Times, Burlington County Times, and Maple Shade Newspaper. Petitioner advertised in 1978 for a millionaire who could financially support her. Petitioner received responses to her advertisements from 2,003 people during 1981, 1982, and 1983. Petitioner listed her husband, Paul Toms, Joseph DeFelice, and Sam Celona in her ledger as "good *154 rich payers". Joseph DeFelice paid a lot of money to the women who worked for petitioner. Petitioner advertised for women to work for her in her business in 1982 and 1983. Petitioner paid the advertising expenses. She allowed her female employees to use her home to provide prostitution services to customers. She installed two telephones for the business. Petitioner maintained a ledger for her prostitution/escort business from 1981 through 1985. Petitioner recorded cash receipts in her ledger next to specified dates. Petitioner did not maintain sufficient records of her business operations for 1981, 1982, and 1983 to prepare correct income tax returns. Petitioner did not pay Federal withholding or FICA tax for her employees or file Forms 1099 or Forms W-2 with the Internal Revenue Service for compensation paid to her employees during 1981, 1982, and 1983. Petitioner did not maintain a business checking account during 1981, 1982, and 1983. Petitioner pled guilty to prostitution in 1985. In 1988 she entered a plea of guilty and was convicted of willful evasion of Federal income tax for 1983 in violation of section 7201. 3. Petitioner's Relationship with Sam Celona
*155 In 1965 petitioner met Mr. Sam Celona. He was 34 years older than petitioner. Mr. Celona was an attendant at the gas station that petitioner's father and petitioner used to frequent. Petitioner was romantically involved with Mr. Celona for 9 years until she married Paul Toms. 4. Petitioner's Relationship with Samuel Cohen
Samuel Cohen is a retired Internal Revenue Service employee. Mr. Cohen was married in 1955. In 1980, he separated from his wife. Mr. Cohen was under a great deal of mental strain from his marital problems from 1980 through 1983. In 1980, Mr. Cohen owned a home in Philadelphia, Pennsylvania. Mr. Cohen received the home from his parents who purchased and titled it in Mr. Cohen's name. Mr. Cohen paid all the living expenses for himself, his family, and his parents when they lived there. Mr. Cohen met petitioner in February 1980. He was looking for female companionship. At their first meeting, Mr. Cohen and petitioner went to dinner and to the movies and then went back to his residence to listen to music and talk. Mr. Cohen paid petitioner $ 200 on their first date. Mr. Cohen gave petitioner money after most, but not all, dates. He paid her about *156 $ 200 per week. Petitioner has visited with Mr. Cohen approximately twice a week from 1980 through 1983, and continuing through the time of trial. Petitioner's visits with Mr. Cohen during the 1980 through 1983 period included dinner, movies, and then going back to Mr. Cohen's residence to listen to music and talk. When petitioner came to Mr. Cohen's house, she stayed approximately 4 or 5 hours. He paid her upon her departure. Mr. Cohen regarded petitioner's visits as a personal necessity. The only companionship he had from 1980 through 1983 was with petitioner. Mr. Cohen's adjusted gross income was $ 16,352 in 1980, $ 17,524 in 1981, $ 18,298 in 1982, and $ 17,843 in 1983. 5. Petitioner's Relationship with Joseph DeFelice
Joseph DeFelice met petitioner in 1982. On May 24, 1982, Mr. DeFelice saw an advertisement in the Burlington County Times for petitioner's escort service. He called petitioner's residence using the telephone number in the advertisement. Petitioner told Mr. DeFelice to come over that day. Mr. DeFelice did, and he paid $ 125 to engage in sexual intercourse with one of petitioner's employees, Michelle Barns. Mr. DeFelice called petitioner at the *157 telephone number in the advertisement several days later. She told him to come to her residence. On the second visit, Mr. DeFelice paid $ 50 to engage in sexual intercourse with another of petitioner's employees named Beth. Between May and December 1982, Mr. DeFelice saw petitioner twice a week. In 1983 Mr. DeFelice saw petitioner three or four times a week. Mr. DeFelice paid money to petitioner every time he saw her. In 1982 and part of 1983 the monthly rent for Mr. DeFelice's apartment was $ 200. In the summer of 1983 Mr. DeFelice moved to the Pitman Hotel and paid $ 46 a week. Mr. DeFelice paid automobile insurance premiums of $ 400 a year for 1982 and 1983. Mr. DeFelice paid $ 25 a week for food and $ 25 a week for gasoline during 1982 and 1983. Mr. DeFelice earned some money in 1982 and 1983 by mowing lawns, collecting aluminum cans, cleaning churches, and having yard sales. During 1982 and 1983, Mr. DeFelice repeatedly conducted a fraudulent scheme to obtain money from gas stations. Mr. DeFelice's scheme involved lying to the gas station manager by stating that he had lost his gas cap at the station. He would then go to an automobile parts store and lie to the store *158 manager to obtain a gas cap receipt. Mr. DeFelice would take the receipt to the gas station to obtain reimbursement from the manager. At the time of the trial Mr. DeFelice lived in an automobile owned by a Mr. Delaney. Mr. DeFelice had been in a State hospital in 1979. Mr. DeFelice did not file a tax return for 1980, 1981, 1982, or 1983. Mr. DeFelice knew that petitioner was a prostitute during 1982 and 1983. 6. Criminal Investigation of Petitioner's Escort Service
From 1980 through 1985, Robert Leach was a sergeant-detective conducting criminal investigations in the Borough of Pitman, New Jersey. Detective Leach began investigating petitioner in 1980 because one of her female employees was beaten by a customer and there were reports that petitioner was involved in drugs and prostitution. As part of his investigation, Detective Leach normally checked petitioner's house approximately twice a day, 3 days a week in 1980 and 1982. Detective Leach kept records of the number of persons entering petitioner's residence from 1980 through 1985. In 1980 Detective Leach observed approximately 100 vehicles going in and out of petitioner's driveway. Some persons parked at a 7-Eleven *159 store parking lot and walked to petitioner's residence. Detective Leach did not investigate petitioner's residence as frequently in 1981. He did note approximately 25 or 30 different vehicles at petitioner's house in 1981. Detective Leach noted approximately 100 different vehicles driven by people who entered petitioner's residence in 1982, and many in 1983. Detective Leach obtained a search warrant for petitioner's house in 1982. He found numerous items of personal property to show that petitioner was operating a house of prostitution. Detective Leach found ledgers, telephone numbers, and notes describing the types of sexual activity that patrons preferred. He also found sex toys, movies, and notes concerning which women were preferred by particular customers. 7. Petitioner's Cash
From 1976 until his death in 1978, Paul Toms was employed at Matlack, Inc., which provided his sole source of income in those years. Paul Toms' gross earnings from Matlack, Inc., were $ 22,236.76 in 1976, and $ 22,111.33 in 1977. His weekly net income was approximately $ 300 in 1976 and 1977. Paul Toms contracted lung cancer in 1977 and received $ 520 in disability payments in 1977 from *160 Matlack, Inc. Paul Toms was in Cooper Hospital for 5 months in 1978. In 1978 petitioner and her husband purchased a 1978 Lincoln Mark V automobile for $ 15,000. Petitioner owned the car as of December 31, 1980, 1981, 1982, and 1983. In 1978, Paul Toms received $ 1,700.88 in gross earnings and $ 2,184 in disability payments from Matlack, Inc.
Petitioner was unemployed from 1976 to 1980. From 1976 until her husband's death in 1978, petitioner's sole source of support was Paul Toms' earnings and disability payments. When her husband died in 1978, petitioner received life insurance proceeds of $ 9,024.41 from RLC Corp., $ 2,500 from Central Pennsylvania Teamsters Pension Fund, and $ 1,183.61 from the Prudential Insurance Co. of America. When her husband died, petitioner became sole owner of real property located at 38 Evergreen Avenue, Pitman, New Jersey, which was purchased by Paul Toms and Rose Toms, Paul's first wife, in 1950 for $ 5,500. Petitioner owned it as of December 31, 1980, 1981, 1982, and 1983. [4]
*161 Paul Toms' estate totaled $ 50,112.35 when he died. His estate included a jointly owned bank account held at First Peoples Bank with a balance of $ 6,161, a Brandywine Sports, Inc. security of $ 109.28, an RLC Corp. security of $ 2,193.07, a pension fund of $ 2,500, and cash of $ 11,500. Paul Toms' first wife, Rose Toms, had an estate of less than $ 5,000 when she died in 1973. Petitioner had a safe deposit box at First Peoples Bank from 1973 through 1981. It was first leased individually to Paul Toms (petitioner's deceased husband), then jointly to Paul Toms and petitioner, and then individually to petitioner. The bank records of First Peoples Bank of New Jersey (FPBNJ) indicate that petitioner maintained two safe deposit boxes at the bank, numbered 845 and 804. Box number 845, showing frequent entry activity between 1977 and 1981, was surrendered and all contents removed on May 8, 1981. Box 804 shows activity in 1975, 1976, 1977, and 1979. Petitioner kept her jewelry and a coin collection in a safe deposit box. As of December 31, 1980, petitioner had cash on hand of $ 12,708.02. As of December 31, 1981, 1982, and 1983, petitioner had cash on hand of $ 400. The cash on *162 hand derived from the insurance proceeds received by petitioner in 1978. 8. Petitioner's Bank Accounts and Investments
a. Petitioner's Financial Institution Accounts
In 1979, petitioner deposited $ 1,000 into a savings account at City Federal Savings and Loan Association (City Federal S&L). In 1979, petitioner received $ 601.54 in interest income from a savings account at FPBNJ, $ 1,437.93 in dividend income from a savings account at Gloucester County Federal Savings and Loan Association (Gloucester S&L), and $ 29.02 in interest income from a savings account at City Federal S&L. In 1980, petitioner had a checking account with an opening balance of $ 2,236.27 at FPBNJ. The account had a yearend balance of $ 1,935.25 for 1980, $ 163.67 for 1981, $ 5,477.13 for 1982, and $ 451.79 for 1983. In 1980, petitioner had a savings account with an opening balance of $ 12,410.12 at FPBNJ. This account earned $ 632.21 interest in 1980, and had a 1980 yearend balance of $ 13,042.33. In 1980, petitioner had a savings account at Empire Savings, Hammonton, New Jersey. Petitioner's account at Empire Savings was credited with interest of $ 93.73 in 1980, and had a 1980 yearend balance *163 of $ 6,809.28. In 1980, petitioner had a savings account with an opening balance of $ 27,652.27 at Gloucester S&L. Dividends totaling $ 1,552.51 were paid into this account for 1980. The account had a 1980 yearend balance of $ 29,204.78. In 1980, petitioner had a savings account with an opening balance of $ 1,029.02 at City Federal S&L. The account earned $ 71.34 interest in 1980. A deposit of $ 240 was made into the account in 1980. The account had a 1980 yearend balance of $ 1,340.36. In 1981, petitioner opened a checking account at the National Bank and Trust Co. of Gloucester County (NBTCGC). The account had a yearend balance of $ 402.29 for 1981, $ 983.66 for 1982, and $ 1,004.94 for 1983. In 1983 petitioner had a checking account at the First Jersey National Bank (FJNB). The account had a 1983 yearend balance of $ 372.64. b. Certificates of Deposit -- 1974 to 1980
Petitioner purchased a $ 1,000 certificate of deposit (CD) at FPBNJ on March 1, 1974, and she owned it on December 31, 1980 and 1981. On August 27, 1975, petitioner purchased a $ 1,000 CD from FPBNJ. It was redeemed on January 29, 1980. On July 30, 1976, petitioner purchased two $ 1,000 CD's from *164 FPBNJ. They were redeemed on July 31, 1980. Petitioner purchased a $ 4,800 CD at FPBNJ on November 27, 1978, and she owned it on December 31, 1980, 1981, and 1982. On January 1, 1979, petitioner purchased a $ 10,000 CD from FPBNJ. It was redeemed on April 1, 1980. Petitioner purchased a $ 1,248 CD at FPBNJ on January 2, 1979, and she owned it on December 31, 1980, 1981, and 1982. Petitioner purchased a $ 4,388 CD at FPBNJ on January 16, 1979, and she owned it on December 31, 1980, 1981, and 1982. Petitioner purchased a $ 2,360.09 CD at FPBNJ on February 5, 1979, and she owned it on December 31, 1980, 1981, and 1982. Petitioner purchased a $ 1,100 CD at FPBNJ on February 20, 1979, and she owned it on December 31, 1980, 1981, and 1982. Petitioner purchased a $ 1,052 CD at FPBNJ on March 26, 1979, and she owned it on December 31, 1980, 1981, and 1982. Petitioner purchased a $ 1,000 CD at FPBNJ on April 23, 1979, and she owned it on December 31, 1980 and 1981. Petitioner purchased a $ 2,115 CD at FPBNJ on June 18, 1979, and she owned it on December 31, 1980, 1981, and 1982. On April 1, 1980, petitioner purchased a $ 10,611.32 CD from First Peoples National Bank (FPNB). It *165 was redeemed on October 6, 1980. Petitioner purchased an $ 11,453.56 CD at FPBNJ in 1980 and she owned it on December 31, 1980. Petitioner purchased a $ 1,000 CD at FPBNJ in 1980, and she owned it on December 31, 1980 and 1981. Petitioner purchased a $ 2,345.28 CD at FPBNJ in 1980, and she owned it on December 31, 1980, 1981, and 1982. c. Bonds
In 1980, petitioner purchased Delaware River Port Authority Bonds for $ 25,288 and $ 10,744, and owned them on December 31, 1980, 1981, 1982, and 1983. Petitioner earned interest in 1980 of $ 3,250 on these bonds. On December 31, 1980, petitioner owned $ 48,018.75 of Series E Savings Bonds and $ 9,100 of bearer bonds. [5]
In 1981, petitioner purchased Alaska Housing Authority Bonds for $ 10,325. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Washington Public Power Supply Bonds for $ 8,600. Petitioner owned these bonds on December 31, 1981, 1982, *166 and 1983. In 1981, petitioner purchased Delaware City, Pennsylvania Bonds for $ 18,250. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Intermountain Power Agency Bonds for $ 5,088. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased St. Mary's Hospital Bonds for $ 10,000. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Philadelphia, Pennsylvania GO Bonds for $ 13,950. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Massachusetts Municipal Wholesale Bonds for $ 9,400. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Georgia Electric Bonds for $ 25,188. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased New Jersey Health Care Bonds for $ 25,250. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased Philadelphia, Pennsylvania GO Bonds for $ 6,240. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. In 1981, petitioner purchased *167 Harrisburg, Pennsylvania Bonds for $ 3,106. Petitioner owned these bonds on December 31, 1981, 1982, and 1983. d. Certificates of Deposit -- 1981
On April 22, 1981, petitioner purchased a $ 130,000 CD at FPBNJ. Petitioner purchased a $ 4,170.95 CD at FPBNJ on May 11, 1981, and she owned this CD on December 31, 1981 and 1982. Petitioner purchased a $ 13,210.47 CD at FPBNJ on October 19, 1981, and she owned it on December 31, 1981 and 1982. Petitioner purchased a $ 35,000 CD at FPBNJ on November 9, 1981, and she owned it on December 31, 1981. Petitioner purchased a $ 104,723.28 CD at NBTCGC on November 9, 1981, and she owned it on December 31, 1981. e. Petitioner's Investments -- 1982
In 1982, petitioner purchased New Jersey Health Care Bonds for $ 15,075. Petitioner owned these bonds on December 31, 1982 and 1983. In 1982, petitioner purchased Philadelphia, Pennsylvania GO Bonds for $ 9,800. Petitioner owned these bonds on December 31, 1982 and 1983. In 1982, petitioner purchased a University Life Insurance security for $ 72,500. Petitioner owned this security on December 31, 1982 and 1983. In 1982, petitioner purchased Executive Life securities for $ 72,500. *168 Petitioner owned these securities on December 31, 1982 and 1983. In 1982, petitioner purchased Charter Life securities for $ 13,000. Petitioner owned these securities on December 31, 1982 and 1983. In 1982, petitioner purchased College TWP securities for $ 34,867. Petitioner owned these securities on December 31, 1982 and 1983. In 1982, petitioner purchased Marion securities for $ 5,000. Petitioner owned these securities on December 31, 1982 and 1983. On July 19, 1982, petitioner purchased a $ 10,651.01 CD at First Fidelity Bank, N.A., South Jersey, which matured on January 19, 1985. Petitioner owned it on December 31, 1982 and 1983. Petitioner purchased a $ 1,293.12 CD at FPBNJ on July 28, 1982, and she owned it on December 31, 1982. f. Petitioner's Investments -- 1983
In 1983, petitioner purchased a Union Central Life Insurance security for $ 95,000. Petitioner owned this security on December 31, 1983. In 1983, petitioner purchased Indepro I securities for $ 15,000. Petitioner owned these securities on December 31, 1983. In 1983, petitioner purchased Indepro II securities for $ 22,500. Petitioner owned these securities on December 31, 1983. In 1983, petitioner *169 purchased Investors Quality Tax Exempt securities for $ 15,000. Petitioner owned these securities on December 31, 1983. In 1983, petitioner purchased International Investors securities for $ 17,480. Petitioner owned these securities on December 31, 1983. In 1983, petitioner purchased Affiliated Fund securities for $ 6,000. Petitioner owned these securities on December 31, 1983. In 1983, petitioner purchased a $ 10,000 CD at First Fidelity Bank, N.A., South Jersey, which matured on November 28, 1986. Petitioner owned this CD at the end of 1983. Petitioner maintained a stock ledger in which she recorded the investments she made in 1981, 1982, and 1983. In it, she listed detailed accounts of her investments, including interest rates, maturity dates, interest payment dates, and account numbers. She also calculated the yearly interest due on some of her investments and recorded these amounts with the respective bond or security. Petitioner also kept a list of outstanding loans she had made to various individuals. In 1980, petitioner lent $ 6,500 to Samuel Granato, Sr. Mr. Granato promised to pay $ 6,500 plus $ 500 interest in 23 monthly payments with a final payment of $ 100, *170 with the first payment due on June 15, 1980. The balance of the loan was $ 4,575 on December 31, 1980, and $ 1,275 on December 31, 1981. 9. Preparation and Audit of Petitioner's Income Tax Returns
Chris Sepe is a tax return preparer for H&R Block. He prepared petitioner's Federal income tax returns for 1980 and 1981. Petitioner brought her Forms 1099 for the interest and dividends she received in those years to Sepe to prepare her returns. He asked her for all information concerning her income from interest, dividends, wages, and any other source. Petitioner did not show Mr. Sepe books or records for her escort business. Petitioner's income tax returns for 1982 and 1983 were prepared by Bruce Young of Blackwood, New Jersey. Petitioner reported on her 1981, 1982, and 1983 Federal income tax returns taxable income of $ 20,936, $ 16,994.77, and $ 8,441.92, respectively. Diane Tomasello is a special agent for the Criminal Investigation Division of the IRS. In 1985 she began to investigate whether petitioner had underreported her income for 1981, 1982, and 1983. Special Agent Tomasello interviewed petitioner in June 1985 about her taxable income from 1980 through 1983. *171 Special Agent Tomasello conducted a standard interview of petitioner which includes a request for information concerning all sources of her income and whether or not she reported it on her income tax returns. Petitioner told Special Agent Tomasello that in 1978 she inherited a safe deposit box from her husband with approximately $ 200,000 cash, bonds, and securities. She stated she had invested the money but could not remember where she had invested it. Petitioner told Special Agent Tomasello that she had a safe deposit box at First Peoples Bank of New Jersey in which she kept her jewelry and coin collection. Petitioner stated in the interview that on December 31, 1980, 1981, 1982, 1983, she had undeposited cash on hand of approximately $ 300 to $ 400. Petitioner told Special Agent Tomasello that the financial institutions where she had invested her money for the years in question were listed on her tax returns. Special Agent Tomasello issued summonses to the financial institutions listed on petitioner's tax returns for 1980 through 1983, including First Peoples Bank of New Jersey, requesting information about all checking and savings accounts, certificates of deposit, safe *172 deposit boxes, currency transaction reports (CTR's), [6] and any outstanding loans of the taxpayer. The summons also requested additional items for each account such as canceled checks, statements, signature cards, and information concerning the existence of a safe deposit box and entry information to it. Special Agent Tomasello did not receive any CTR's from the summoned banks for the years under investigation. Special Agent Tomasello received a response from First Peoples Bank about CD's and savings and checking accounts, but received no information about a safe deposit box. During her investigation, Special Agent Tomasello did not find any evidence that petitioner had a safe deposit box at First Peoples Bank of New Jersey in 1981 through 1983. However, the parties discovered on November 14, 1990, that petitioner had a safe deposit box at First Peoples Bank of New Jersey. The First Peoples Bank of New Jersey *173 rechecked its files and reported that the information originally provided to Special Agent Tomasello was incorrect. Special Agent Tomasello reconstructed petitioner's income for the years in question by a net-worth plus nondeductible personal expenditures method. She used this method because petitioner's books and records for the years in question were inadequate. Special Agent Tomasello was aware of the $ 130,000 CD purchased by petitioner from First Peoples Bank of New Jersey on April 22, 1981, which matured on October 21, 1981, when she prepared her net worth analysis. She took into account the funds derived from the redemption of this CD as of December 31, 1981. Special Agent Tomasello also interviewed Joseph Toms, petitioner's brother-in-law. Petitioner lived with Joseph Toms from 1978 to 1984. Joseph Toms told Special Agent Tomasello that he gave petitioner $ 300 to $ 400 a week from 1981 through 1983. In the course of her investigation, Special Agent Tomasello requested the tax returns of Joseph Toms to verify his income from 1981 through 1983. She also requested transcripts of account for Joseph Toms for years 1981 through 1989. For 1981, Joseph Toms had adjusted *174 gross income of $ 1,220.41. Mr. Toms did not file Federal income tax returns for 1982 and 1983. Mr. Toms' adjusted gross income was $ 5,428 for 1984 and $ 3,520 for 1985. The purchase and ownership of securities totaling $ 24,875 (i.e., New Jersey Health Care security for $ 15,075 and Philadelphia, Pennsylvania GO bonds for $ 9,800) was taken into account by respondent in the net worth computation for 1981. However, the correct year of the purchases is 1982. Special Agent Tomasello attempted to verify the existence of businesses reported by petitioner to have been owned by Joseph Toms, but found no record of any businesses. Special Agent Tomasello obtained the New Jersey estate inheritance tax returns filed by petitioner for Paul Toms. It indicated that he had no more than $ 50,000 of assets when he died. Special Agent Tomasello concluded that petitioner had assets of $ 224,377.20 as December 31, 1980, consisting primarily of CD's, securities, and a small amount of undeposited cash. Petitioner reported total income from her escort service on her 1981, 1982, and 1983 returns of $ 2,000, $ 4,100, and $ 9,215, respectively. Petitioner had personal expenses of at least $ 2,643.65 *175 in 1981, $ 12,433.24 in 1982, and $ 3,333.14 in 1983. Petitioner had nontaxable receipts of at least $ 22,112.55 in 1981, $ 23,358.08 in 1982, and $ 49,890.40 in 1983. This includes $ 18,662.55 in 1981 and $ 2,566.08 in 1982 inherited by petitioner from the Estate of Mary Toms. These inherited amounts represent the total funds received by petitioner from the Estate of Mary Toms. Petitioner had itemized deductions of $ 2,478.84 in 1982. She is entitled to a $ 1,000 exemption for each of the years 1981, 1982, and 1983. On December 31, 1980, 1981, 1982, and 1983, petitioner had no liabilities. OPINION 1. Respondent's Use of Net Worth Plus Nondeductible Expenditures Method to Determine Amount of Petitioner's Underreported Income
The first issue for decision is whether to sustain respondent's reconstruction of petitioner's income for 1981, 1982, and 1983 through the net worth plus nondeductible expenditures method. Petitioner did not keep adequate books and records from which to compute her taxable income. Respondent's use of the net worth plus nondeductible expenditures method to determine taxable income is appropriate under these circumstances. See Holland v. United States, 348 U.S. 121, 130-132 (1954); *176 Breland v. United States, 323 F.2d 492, 496 (5th Cir. 1963); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Compare Agnellino v. Commissioner, 302 F.2d 797, 799 (3d Cir. 1962), affg. in part and vacating in part T.C. Memo. 1961-22 (use of "sheet count" method to reconstruct income from motel business permissible); Schroeder v. Commissioner, 291 F.2d 649, 652 (8th Cir. 1961), affg. T.C. Memo. 1957-162 (use of net worth method to value cattle in absence of separate records of various herds permissible). Where the Commissioner is compelled to use the net worth method to determine the taxpayer's income because of her failure to maintain adequate books and records for the years, the taxpayer has a heavy burden to discredit the determination. Schroeder v. Commissioner, supra at 653. A reasonable construction of income will be presumed correct. Breland v. United States, supra; Agnellino v. Commissioner, supra.
Petitioner claims that the funds *177 for her investments (and thus substantial portions of the net worth increases) came from: (1) A $ 60,000 cash hoard given to her by Sam Celona, (2) money in a safe deposit box given to her by Paul Toms, and (3) nontaxable gifts from Samuel Cohen and Joseph DeFelice. Based on (1) and (2), petitioner contends that respondent understated the amount of undeposited cash she had on hand on December 31, 1980. Petitioner argues that in giving petitioner credit for only $ 12,708.02 in undeposited cash on hand as of December 31, 1980, respondent ignored petitioner's consistent assertions to the contrary. Petitioner maintains that respondent failed to include all amounts of available cash in the net worth computation which necessarily destroys the accuracy of respondent's determination. Petitioner further argues that once a taxpayer shows a material error in respondent's computations, the presumption of correctness disappears and the burden of going forward with evidence shifts to respondent. Petitioner argues that the net worth method as applied to 1981 fails because respondent has not established petitioner's opening net worth with reasonable accuracy. Respondent claims to have investigated *178 all known and relevant leads and allowed for sufficient funds as of December 31, 1980, for use by petitioner in 1981, 1982, and 1983. We agree with respondent. Petitioner's claim that she inherited $ 200,000 in 1978 from her husband is contradicted by the inheritance tax return she filed which indicated that he had no more than $ 50,000 of assets when he died. Also, Paul Toms' first wife, Rose Toms, had an estate of less than $ 5,000 when she died in 1973. Respondent investigated petitioner's assertion that Joseph Toms gave her $ 300 to $ 400 per week during 1981 through 1983. Joseph Toms' 1981 tax return indicated adjusted gross income of only $ 1,220.41. He did not file tax returns for 1982 and 1983 and his adjusted gross income in 1984 and 1985 was only $ 5,428 and $ 3,520, respectively. Respondent investigated the assertion that Joseph Toms owned some small businesses and found no evidence of the existence of these businesses. We do not believe that Joseph Toms gave petitioner $ 15,600 to $ 20,800 per year during 1981 through 1983. Based on the net worth analysis, respondent established that petitioner had sufficient assets to buy the $ 130,000 CD at the beginning of *179 1981 (which petitioner did not own on December 31, 1981) consisting of: cash on hand of $ 12,708.02; cash in banks of $ 52,332; loan repayment of $ 1,925; tax exempt bond interest of $ 3,250; dividend income of $ 10,918 and interest income of $ 128; an $ 11,453.56 CD; and bonds of $ 57,118.75. In 1981 petitioner had nontaxable receipts of $ 22,112.55 including a lump-sum receipt of $ 18,662.55 from the Estate of Mary Toms. These items total $ 171,945.55. Respondent's net worth analysis showed that between 1981 and 1983 petitioner acquired $ 391,103.68 in assets. The parties stipulated that petitioner had total assets of $ 224,377.20 on December 31, 1980, $ 380,932.53 on December 31, 1981, $ 477,515.21 on December 31, 1982, and $ 615,480.88 on December 31, 1983. The joint stipulation and additional evidence presented at trial establish that petitioner received income from her prostitution/escort service. The net worth increases create inferences of taxable income if the Government is able to show a likely source of unreported income or negate all possible nontaxable sources. Manzoli v. Commissioner, 904 F.2d 101, 104 (1st Cir. 1990), affg. T.C. Memo. 1988-299. *180 Respondent has established a likely source of the unreported income and has also negated all reasonably possible sources of nontaxable receipts. The likely source of the income was petitioner's prostitution/escort service. Accordingly, we hold that respondent's use of the net worth plus nondeductible expenditures method was proper in determining petitioner's income for 1981, 1982, and 1983. 2. Petitioner's Cash Hoard Claim
Petitioner testified that she accumulated $ 60,000 cash from 1966 through 1976 from gifts she received from Sam Celona. Petitioner stated that Mr. Celona gave her approximately $ 150 a week in $ 10 and $ 20 bills, and that she saved them and went to the bank weekly to change them for $ 100 bills. Petitioner further testified that at the time of her marriage to Paul Toms, she kept the $ 60,000 cash she had saved in two different safe deposit boxes. Petitioner's testimony relating to the cash hoard is uncorroborated. As of December 31, 1980, petitioner stated that she had at least $ 40,000 of the $ 60,000 she received from Mr. Celona in a safe deposit box. Petitioner testified that when she met Paul Toms in 1974, he had $ 200,000 in cash in a safe deposit *181 box at First Peoples Bank. She stated that Paul Toms and his first wife, Rose Toms, had accumulated the $ 200,000 over a 40-year period. Petitioner testified that the money remained in the safe deposit box until 1980, except for $ 35,000 that petitioner invested. Petitioner contends that her husband left her $ 200,000 in cash and securities at his death. From 1978 when he died until 1980, petitioner contends that her sole source of support was her husband's earnings and disability payments and the death benefits and inheritance referred to above. Petitioner claims she had approximately $ 205,000 of this cash hoard in her possession at the end of 1980 ($ 165,000 from Paul Toms and $ 40,000 from Sam Celona). Also, petitioner had $ 224,377.20 of investments at the end of 1980. Thus, petitioner maintains that on December 31, 1980, she had net worth of $ 429,377.20, consisting of $ 205,000 cash and $ 224,377.20 of investments. The record does not contain any corroboration that Paul Toms had accumulated $ 200,000 during his lifetime, or any credible explanation of how Paul Toms and his first wife, Rose Toms, could have accumulated $ 200,000. There is no evidence that Paul Toms *182 or his first wife had the financial capability to save such a large amount of money especially given his earning capacity before his death. His estate was valued at only $ 50,112.35 at the time of his death. His net earnings in 1976 and 1977 were $ 15,000 per year. His illness in 1978 reduced the total household income to $ 16,592. His first wife's estate at the time of her death in 1973 was less than $ 5,000. This evidence suggests that Paul Toms and his first wife could not have accumulated such vast wealth. Petitioner's claim that she had an additional $ 60,000 cash hoard from Sam Celona is unbelievable. Although petitioner stated on direct examination that the $ 60,000 she accumulated from payments by Sam Celona was kept in a safe deposit box in Newfield, New Jersey, she later stated that she took the money Sam Celona gave her and placed some of it in the Newfield box and some of it in a safe deposit box located at First Peoples Bank of South Jersey. We think it is highly unlikely that petitioner would keep such a large sum of money in a safe deposit box given her sophistication regarding her investments. We believe that petitioner would not have allowed this large amount *183 of funds to remain idle in a safe deposit box, but would have invested the funds as she accumulated them. Respondent relies on the source and application of funds method to establish that petitioner did not have a cash hoard on December 31, 1980. The schedule shows a negative application of funds by petitioner of $ 32,322.24 for years 1974 through 1980, that is, petitioner was spending in excess of visible earnings. The excess spending occurred mainly in 1979 and 1980. Any money petitioner received she spent primarily on investments. She did not accumulate cash. We conclude that petitioner's cash hoard claims are implausible attempts to challenge the opening net worth determined by respondent. We have examined the items and the evidence on such items of the net worth computation and find no convincing reason for disagreeing with them. 3. Amounts Given to Petitioner by Mr. Cohen and Mr. DeFelice
Petitioner asserts that she received gifts from Mr. Cohen and Mr. DeFelice during 1981 through 1983. However, we conclude that the amounts she received from Mr. Cohen and Mr. DeFelice were not gifts but payments for prostitution and escort services. Petitioner testified that *184 she viewed Joseph DeFelice and Samuel Cohen as her "sugar daddys". Petitioner saw both men during 1982 and 1983, and both paid her money regularly. Mr. Cohen's and Mr. DeFelice's testimony that these transfers were gifts is completely unpersuasive. a. Mr. Cohen
Petitioner argues that Mr. Cohen paid her money out of love and affection, intended as gifts. Mr. Cohen was under considerable mental strain during 1980 through 1983. He felt petitioner's visits were therapeutic. Mr. Cohen paid petitioner on a regular basis. Petitioner visited Mr. Cohen 2 days a week. She stayed approximately 4 hours per visit and he paid her before she left. He paid her $ 200 after their first meeting and continued to pay her $ 200 a week. Mr. Cohen's claim of a cash hoard is exaggerated. Mr. Cohen testified that the money he gave to petitioner was from a $ 50,000 cash hoard that he and his parents saved over approximately 12 years beginning in 1960. Mr. Cohen testified that the money was kept in a safe deposit box until 1980. He testified that he paid all household expenses including the home mortgage out of his earnings. Since his earnings were only $ 17,000 a year in 1983, they must *185 have been considerably less during 1960 through 1972. He only saved about 2 years of his father's salary since his father died in January 1963. The rest of the savings allegedly came from his mother's Social Security, pension benefits, and inheritance. It appears that he paid petitioner from current income and savings. Petitioner bears the burden of proving that the funds from Mr. Cohen were gifts and not compensation for services. Whether a transfer of funds is a gift is based upon an objective inquiry into the facts. Commissioner v. Duberstein, 363 U.S. 278, 289 (1960). Mr. Cohen testified that he has not had sexual relations with petitioner. That is immaterial to our decision. Mr. Cohen paid petitioner for the first evening she spent with him and paid her most nights she saw him. This suggests a paid escort relationship, not gifts to a friend. Jones v. Commissioner, T.C. Memo. 1977-329; Blevins v. Commissioner, T.C. Memo. 1955-211, affd. 238 F.2d 621 (6th Cir. 1956). While we do not question the importance Mr. Cohen places on his companionship with petitioner, we believe that his regular payments *186 to her were not out of feelings of "'detached and disinterested generosity,' 'out of affection, respect, admiration, charity or like impulses'", as required under Commissioner v. Duberstein, supra at 285 (quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956) and Robertson v. United States, 343 U.S. 711, 714 (1952)). Instead, we believe the payments were for services rendered, and therefore are not gifts within the meaning of section 102(a). Accordingly, these payments are taxable income under section 61. b. Mr. DeFelice
Mr. DeFelice was not a credible witness. He testified that he has lied in the past to obtain money. His contention that the money he gave petitioner was gifts is unpersuasive. He suggested that their relationship had blossomed into a love affair and that he showered petitioner with more money than he conceivably had. He paid petitioner on a regular basis. He began seeing her twice a week in May 1982 and three to four times a week in 1983. Each week he paid her. We find that the payments were for services rendered, not gifts. The total amount of money actually given by Mr. DeFelice is *187 also questionable. Mr. DeFelice stated he gave petitioner $ 600 to $ 650 a week which is approximately $ 31,000 to $ 33,800 a year. Since he saw her approximately 7 months in 1982, he would have given her approximately $ 19,000 in 1982 and $ 33,800 in 1983. His recounting of the sources of his income is incredible. For example, Mr. DeFelice testified that his sources of income in 1982 and 1983 were from mowing lawns at approximately $ 15 to $ 25 a lawn, cleaning churches, lying to gas station managers and automobile parts stores, and having yard sales. He said he towed his lawn equipment consisting of mower, rake, and shovel from lawn to lawn behind his bicycle. While bicycling with his equipment, he collected in a basket on the front of his bicycle aluminum cans he found along his route, which he sold. He stated he could do approximately 6 to 10 lawns a day working 6 days a week. He stated that he mowed lawns from April to December, earning $ 650 to $ 750 a week. We find it implausible that Mr. DeFelice earned as much as he claims in this fashion. DeFelice testified that he gave petitioner all of the money he made in a week, and kept only $ 50 for himself (approximately *188 $ 2,600 per year). He also testified that his rent for 1982 to 1983 was approximately $ 2,400 per year. Also, he stated that he needed approximately $ 5,400 to cover all of his expenses (including rent) during 1982-83. In essence he said he gave petitioner all of his money and barely kept enough to pay his rent. We distinguish cases such as Reis v. Commissioner, T.C. Memo. 1974-287; Libby v. Commissioner, T.C. Memo. 1969-184; and Starks v. Commissioner, T.C. Memo. 1966-134, in which this Court accorded gift treatment to transfers of cash and property to young women from older men as part of a personal relationship. In those cases, this Court found that each of the taxpayers was the mistress of the man from whom she received gifts; there was no indication that the taxpayers were involved in a business arrangement or that the payments were for services rendered. These cases are inherently factual. Here we find that petitioner was operating an escort/prostitution business, and amounts received from Mr. Cohen and Mr. DeFelice were payments for services, not gifts. See Jones v. Commissioner, supra; *189 Blevins v. Commissioner, supra.Compare United States v. Harris, 942 F.2d 1125 (7th Cir. 1991) (convictions of twin sisters, who each received more than a half million dollars from a wealthy individual over several years, for willfully evading income tax reversed because Government's evidence was insufficient to show either that money taxpayers received was not a gift or that they willfully failed to pay tax). 4. Fraud
The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Stratton v. Commissioner, 54 T.C. 255, 284, modified 54 T.C. 1351 (1970). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Respondent must establish: (1) That petitioner has underpaid her taxes for each year, and (2) that some part of the underpayment was due *190 to fraud. Sec. 6653(c); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). The precise amount of the underpayment resulting from fraud need not be proved. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). The statute requires only a showing that "any part" of an underpayment results from fraud. Sec. 6653(b). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud, however, may be inferred from any conduct, the effect of which is to mislead or conceal, Spies v. United States, 317 U.S. 492, 499 (1943), or otherwise prevent the collection of taxes, Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; or where an entire course of conduct establishes the necessary intent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Kotmair v. Commissioner, 86 T.C. 1253, 1260 (1986); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); see Stone v. Commissioner, 56 T.C. 213, 224 (1971). *191 The sophistication of the taxpayer is also relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 502 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Kucera v. Commissioner, T.C. Memo. 1989-424. Fraud may also be proven by circumstantial evidence (including the implausibility of the taxpayer's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951), because direct evidence of the taxpayer's intent is rarely available, Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the intentional commission of an act or acts for the specific purpose *192 of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The courts have developed a number of objective indicators, or "badges", which tend to establish fraud. See Bradford v. Commissioner, supra at 307-308; Recklitis v. Commissioner, supra at 910. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Drobny v. Commissioner, supra at 1349; Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). Respondent contends that petitioner systematically and repeatedly failed to report substantial amounts of income for all of the years in question, and intentionally failed to maintain adequate books and records of her business operation. Respondent *193 further claims that petitioner's financial sophistication shows she was keenly aware of her duty to report all of her income from her business and that she intentionally failed to do so. We find several indicia of fraud present in this case. Petitioner substantially understated her income for all 3 years before us. Petitioner reported income of $ 20,936, $ 16,994.77, and $ 8,441.92, for 1981, 1982, and 1983, respectively. However, respondent's net worth computation shows that petitioner understated her income for 1981, 1982, and 1983 in the amounts of $ 115,150.43, $ 65,184.23, and $ 81,966.49, respectively. This pattern of repeated gross understatements of income without an adequate explanation is evidence of fraudulent intent. Holland v. United States, 348 U.S. 121, 139 (1954); Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3d Cir. 1957), affg. in part T.C. Memo. 1956-155. Petitioner's failure to keep accurate books and records of the sales and expense from her business operation was a deliberate attempt to conceal the illegal nature of her business from respondent. Her different methods of recording her financial *194 activity demonstrate a deliberate attempt to conceal. Petitioner was meticulous in keeping track of her investments. She listed detailed accounts of every investment, including account numbers, interest rates, maturity dates, interest payment dates, and purchase prices. In contrast, petitioner's ledger for income earned from her prostitution/escort business is largely unintelligible. For example, there are no clear cash receipts or cash disbursement records of the gross sales and expenses incurred by her operations during the years in issue. There is no record of the personnel she employed or the wages or compensation paid during the issue years. There is no evidence of a business checking account, any Federal withholding or FICA tax paid by petitioner, or any Forms 1099 or Forms W-2 issued by petitioner. Petitioner's business ledger lists various amounts of cash with specific dates, but it is impossible to determine from this ledger the periods in which her business earned this cash. The ledger also contains names of patrons followed by numbers in an apparent code. Petitioner is financially sophisticated. She began investing in CD's in 1974, and has consistently invested *195 her money in CD's and securities since then. She methodically records her investments using standard financial jargon when discussing purchase and sales price. Her financial acumen increased her total worth through investments from $ 199,302.20 in 1980 to approximately $ 594,980.88 in 1983. Petitioner memorialized loans made to individuals. Further, petitioner successfully managed her own business. Despite her lack of formal education, petitioner was knowledgeable about her business and personal affairs and knew she was required to report all income from her business activity. Libby v. Commissioner, T.C. Memo. 1969-184. Petitioner concealed the business earnings from her accountant for 1980 and 1981. She admitted that she did not report all of her earnings derived from the prostitution/escort service for 1982 and 1983. She was convicted in 1988 of willful evasion of Federal income tax for 1983 in violation of section 7201. We conclude that petitioner is liable for the addition to tax for fraud for 1981 and 1982. As noted, petitioner has conceded that she is liable for the addition to tax for fraud for 1983. Accordingly, we do not reach respondent's *196 alternative theory of negligence for 1982. 5. Timeliness of Assessment and Collection -- Section 6501(c)(1)
Petitioner argues that the statute of limitations bars assessment of tax for 1981 and 1982. We have held that petitioner filed false and fraudulent income tax returns with intent to evade tax for 1981 and 1982. Consequently, assessment and collection of tax for those years may be made at any time. Sec. 6501(c)(1). 6. Substantial Understatement of Income Tax
The next issue for decision is whether petitioner is liable for the addition to tax for substantial understatement of income tax under section 6661(a). Section 6661(a) provides for an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is the amount by which the correct tax exceeds the tax reported on the return. Sec. 6661(b)(2)(A); Mailman v. Commissioner, 91 T.C. 1079, 1081 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioner bears the burden of proving that imposition *197 of the addition to tax under section 6661 is erroneous. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989). Petitioner substantially understated her income tax for 1982 and 1983 by $ 33,168.08 and $ 36,449, respectively. Therefore, petitioner is liable for the addition to tax for substantial understatement under section 6661(a) for 1982 and 1983. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. On brief, respondent adjusted the deficiency and fraud addition for 1981 in accordance with the increased deficiency and additions to tax for 1982 asserted in the amended answer. ↩
3. Fifty percent of the interest due on the deficiency for the taxable year.↩
4. We note that the Evergreen property was valued at $ 26,774 for estate tax purposes when Paul Toms died in 1978. Respondent valued the Evergreen property at $ 5,500 for all years involved in the net worth analysis. It does not detract from respondent's net worth computation since petitioner owned the property throughout the years involved.↩
5. The issuer of the bearer bonds is not identified in the record.↩
6. A CTR is a report banks are required to file whenever someone makes a cash deposit of $ 10,000 or more.↩